**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

United States of America,                              Crim. No. 17-204 (JRT/BRT)

           Plaintiff,

v.                                                     **REPORT AND
                                                       RECOMMENDATION**

Gadelle Dante Ferguson,

           Defendant.

Thomas Calhoun-Lopez, Esq., United States Attorney's Office, counsel for Plaintiff.

Shannon R. Elkins, Esq., Office of the Federal Defender, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

       Defendant Gadelle Dante Ferguson was charged with two counts of possession

with intent to distribute methamphetamine. (Doc. No. 1, Criminal Compl.) On

September 11, 2017, Defendant moved to suppress the contents of Federal Express

Package 78678846519 that was mailed to him and seized by Minneapolis-St. Paul

("MSP") Airport Police Department Detective Mark Meyer on or about April 28, 2017.

(Doc. No. 20.) This Court held a hearing on this motion on October 3, 2017. (Doc. No.

24.) At the hearing, Detective Meyer testified about his duties as a narcotics K-9 handler,

use of a drug-sniffing dog named Whinny, and how he came to seize the FedEx package

at issue in this case. (Doc. No. 30, 10/3/17 Mot. Hr'g Tr. (hereinafter "Tr.") 4–46.) The

Government also introduced the following exhibits: (1) a photograph of the FedEx label

on the outside of the seized package; (2) a Hennepin County search warrant application, search warrant, and return; (3) a photograph of the inside of the seized package; (4) a photograph of a wrapped item inside of the seized package; (5) a photograph of the wrapped item on a scale; and (6) three certificates from the United States Police Canine Association, Regional Narcotic Detection, for Detective Meyer and Whinny. (Doc. No. 25, Exhibit List, Gov't Exs. 1–8.) Defendant introduced one exhibit, a series of canine activity logs for Detective Meyer and Whinny spanning from 1/20/15 to 4/26/17. (*Id.*, Def. Ex. 1.)

Based on the evidence presented at the hearing, and for the reasons detailed below, this Court recommends that Defendant's Pretrial Motion to Suppress Search and Seizure Evidence (Doc. No. 20) be denied.

## I.    Factual Background

### A.    Detective Meyer and Whinny

Detective Meyer began working for the MSP airport police in 1990 as a patrol officer. (Tr. 4.) In 1997, Detective Meyer became a narcotics K-9 handler after going through a month-long training program at the St. Paul Police K-9 handler school. (Tr. 5.) Detective Meyer has also been trained in the interdiction of narcotics, taking classes such as parcel interdiction, bus interdiction, and train interdiction. (*Id.* at 6.) Detective Meyer also teaches parcel interdiction, and he trains law enforcement agencies in the use of K-9s. (*Id.* at 6, 23.) Detective Meyer has handled four dogs in his career as a K-9 handler. (*Id.* at 7.) He has been handling his current dog, a female lab mix named Whinny, for

three years. (*Id.* at 7–8.)[1] Detective Meyer's day-to-day duties with Whinny involve parcel interdiction at the airport. (*Id.* at 8.)

Whinny is certified by the United States Police Canine Association to detect narcotics, including marijuana, cocaine, crack, heroin, methamphetamine, ecstasy, mushrooms, and opium. (*Id.* at 17–18, 22; Gov't Exs. 6–8.) Whinny is also trained to detect the odor of narcotics on U.S. currency. (*Id.* at 33.) Whinny is trained primarily by Officer Meyer, but she occasionally trains with a person outside the airport police, a former K-9 handler for the Minnetonka Police Department, twice a year for a couple of hours. (*Id.* at 35.)

To become certified, a handler has to show during a timed test that his or her dog can find narcotics hidden in three rooms in a house and five cars. (Tr. 22.) In the car portion of the test, the dog has ten minutes to search through five cars. (*Id.* at 34.) In the house portion of the test, there are two "hides" spread over three rooms, and the dog is allowed twelve to fifteen minutes depending on the square footage of the house. (*Id.*) Whinny was first certified in 2015 and has maintained her certification on a yearly basis. (*Id.* at 23; Gov't Exs. 6–8.) Detective Meyer gauges Whinny's reliability as above average, as she is generally able to find narcotics and generally does not falsely alert. (Tr. 23.) Whinny does falsely alert on occasion, as do all narcotics dogs, but Detective Meyer believes that Whinny's mistakes are "within an acceptable tolerance." (*Id.* at 24, 36–40; Def.'s Ex. 1.) Whinny has, for example, falsely indicated on parcels touched by

---

[1]     Whinny lives with Detective Meyer. (Tr. 30–31.)

Detective Meyer and another handler. (Tr. 37–38.) Detective Meyer attributed these instances to "handler error," either "going too slow" or the handler's odor. (*Id.* at 37.) Detective Meyer testified that Whinny's errors have primarily been with room hides, which Detective Meyer attributes to "a trainer issue that needs to be worked out." (*Id.* at 39.) Whinny has not had long-term or chronic falsing issues with parcels. (*Id.* at 45.)[2]

### B.   Parcel Intercepted at MSP on April 28, 2017

On the morning of April 28, 2017, Detective Meyer was watching inbound parcels at the airport's Federal Express warehouse site. (*Id.* at 8.) In order to "check for incoming narcotics," Detective Meyer was "looking mainly for air parcels, Priority Overnight, person to person." (*Id.* at 9.) He was stationed towards the end of a conveyer belt, which runs the length of the building, watching packages that had been unloaded from two aircrafts. (*Id.* at 8–9.) Whinny was in Detective Meyer's car outside of the warehouse. (*Id.* at 30–31.)

At 6:29 a.m., Detective Meyer observed a package shipped Priority Overnight from Torrance, California. (*Id.* at 10, 15; Gov't Ex. 1.) Detective Meyer took the package off the conveyer belt for further inspection and placed the package on the ground. (Tr. 15–16.) The package caught Detective Meyer's attention because Priority Overnight is a very expensive way to ship a parcel; this parcel cost $188.00 to ship. (*Id.* at 10–11.) The package was also suspicious because it came from California, which is considered a

---

[2]     When Whinny commits errors, the errors are not reported to the certification authorities. (Tr. 35.) The only person keeping track of Whinny's errors is Detective Meyer in his personal notes. (*Id.* at 36.)

"source state" and a hot spot for narcotics. (*Id.* at 12.) These were the two reasons—cost of shipping and origin—that caused Detective Meyer to remove the package from the conveyer belt and place it on the ground at his feet. (*Id.* at 27, 29.) Detective Meyer handled the package with his bare hands and wore no gloves. (*Id.* at 31–32.)

Upon further inspection, Detective Meyer discovered that according to the air bill, the package was shipped from a company called Candle Craft Center LLC to an individual at a residence named "Bulow Todd," which Detective Meyer presumed to mean first name Todd, last name Bulow. (*Id.* at 11; Gov't Ex. 1.) This was considered unusual because in Detective Meyer's experience, Priority Overnight is usually used to ship from company-to-company. (*Id.*) Detective Meyer also thought it unusual that someone would need candles so quickly that they would pay the cost for Priority Overnight. (*Id.* at 12.) A quick Google search on his phone, moreover, suggested that Candle Craft Center was a fictitious company. (*Id.*)

Detective Meyer took a picture of the air bill on the package with his phone and texted it to his analyst with the airport police department. (*Id.* at 13.) Analysts are on loan from the Air National Guard, have access to law enforcement databases, and are "very efficient with the computer as far as looking up names and addresses and being able to figure out if the people live there, if they have a drug history or, in this case, whether Candle Craft existed." (*Id.* at 13–14.) Using a law enforcement database called CLEAR,

and also a California business database,[3] the analyst could not find any listings for Candle Craft Center. (*Id.* at 14, 30.)[4] The analyst found no records in Minnesota associated with a person named Todd Bulow. (*Id.* at 14.) There was also a phone number on the air bill, and the analyst determined that there were three narcotics investigations associated with that number. (*Id.* at 14–15.) The analyst could not describe what those investigations were, or where the number fit in with those investigations. (*Id.* at 15.)

At 6:45 a.m., Detective Meyer moved the package from the conveyer belt area onto a FedEx truck in the warehouse. (*Id.* at 16.) The truck was about forty feet from the conveyer belt inside the warehouse. (*Id.* at 31.) Detective Meyer touched other boxes on the truck, and then he went into two or three other FedEx trucks and touched parcels on those trucks. (*Id.* at 16, 32, 46.) Detective Meyer touched boxes with various parts of his body, including his hands, his thigh, and the back of his arm. (*Id.* at 32.) Detective Meyer did this because he did not want his dog to key on his scent, and to minimize the possibility of suggesting a particular box. (*Id.* at 16–17.) Detective Meyer then retrieved Whinny from his car and had Whinny run over the boxes in the trucks that he entered.

---

[3]     Defendant asserts that Detective Meyer gave conflicting testimony as to whether CLEAR is a law enforcement database. (Def.'s Mem. 3.) The Court does not agree. Instead, Detective Meyer expressed uncertainty about the status of the California database. (*See* Tr. 14 (testifying on direct examination that "[the analyst] used a database called CLEAR. *He also—this is—I don't think this is a law enforcement database, but he also looked up on California business something*—I don't recall what it was, but a website that, I guess, lists the names of various business and could not find the Candle Craft Center") (emphasis added); Tr. 30 (testifying on cross-examination that "I think CLEAR is a law enforcement database").)

[4]     Detective Meyer gave conflicting testimony as to whether the analyst searched for the term "Candle Craft Center," "Candle Craft Center LLC," or both. (*See id.*)

(*Id.* at 17, 32, 46; Gov't Ex. 2 at 2.) Detective Meyer estimated that there were about ten to fifteen boxes in each truck. (*Id.* at 32.) After going through three other trucks, Whinny alerted to a box on the fourth truck, the box pictured in Government Exhibit 1, by going into a "sit." (*Id.* at 17, 46; Gov't Ex. 2 at 2.) After Whinny alerted, Detective Meyer wrote a receipt to FedEx for the package, brought the box back to his office, and submitted an application for a search warrant. (*Id.* at 18; Gov't Ex. 2.) The warrant application did not include any information regarding Whinny's false alert issues or Detective Meyer's actions in touching the subject package and the other packages in the trucks. (Gov't Ex. 2.) The search warrant was issued at 9:30 a.m. (Tr. 20; Gov't Ex. 2 at 5.)

Pursuant to the warrant, Detective Meyer opened the package with his sergeant and lieutenant. (*Id.* at 20.) Inside, the officers discovered a wooden box surrounded by an outer white portion of Styrofoam. (*Id.*; Gov't Ex. 3.) A 5.1 pound, shrink-wrapped package was inside the box. (Tr. 20–22; Gov't Exs. 4, 5.) A field test yielded a positive result for methamphetamine. (Tr. 21.)

## II.   Analysis

Defendant argues that the seizure of his FedEx package violated the Fourth Amendment because Detective Meyer lacked reasonable articulable suspicion for the seizure. (Doc. No. 33, Def.'s Mem. in Supp. of Mot. to Suppress Search and Seizure Evid. ("Def.'s Mem.") 6–13.) Defendant also argues that the subsequent search of the package was a separate Fourth Amendment violation because law enforcement lacked probable cause to justify the search. (*Id.* at 14–17.) Thus, Defendant maintains that the

fruits of the search should be suppressed. (*Id.* at 17–20.) In response, the Government argues that Detective Meyer had reasonable suspicion to justify seizing the package, and the nature and extent of the seizure was not unreasonable. (Doc. No. 22, Gov't's Omnibus Resp. to Def.'s Pretrial Mots. ("Gov't's Omnibus Resp.") 4–6; Doc. No. 35, Gov't's Resp. to Def.'s Mem. in Supp. of Mot. to Suppress Evid. ("Gov't's Resp.") 3–7.) The Government also argues that the subsequent search of the package pursuant to a warrant was supported by probable cause. (Gov't's Omnibus Resp. 7; Gov't's Resp. 7–9.) Finally, the Government argues that even if the warrant was not supported by probable cause, the good faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984) would apply, and the evidence should not be suppressed. (Gov't's Omnibus Resp. 7–8; Gov't's Resp. 7–9.)

### A.    Detective Meyer Had Reasonable Suspicion to Seize the Package, and the Nature and Extent of the Seizure Was Not Unreasonable

Individuals have a right to be free from unreasonable searches and seizures of items they place in the mail. *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (citing *United States v. Leeuwen*, 397 U.S. 249, 251 (1970)). A law enforcement officer "must have reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004) (citing *Johnson*, 171 F.3d at 603). Reasonable suspicion must be grounded in a "particularized and objective basis" that is more than an "inchoate and unparticularized suspicion or hunch." *Johnson*, 171 F.3d at 603 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). It also must be based on

articulable facts, that is, the officer must be able to explain the basis of his or her

suspicion. *Smith*, 383 F.3d at 704 (citing *Johnson*, 171 F.3d at 604). The basis of the

officer's belief may be facts which appear innocuous to an untrained eye, "but which, to a

trained officer familiar with the methods of drug traffickers, are sufficient to establish

reasonable suspicion." *Id.* Courts analyze the "totality of the circumstances" that arguably

support a determination of reasonable suspicion, "evaluating those circumstances as they

would be 'understood by those versed in the field of law enforcement.'" *United States v.*

*Demoss*, 279 F.3d 632, 636 (8th Cir. 2002) (quoting *United States v. Cortez*, 449 U.S.

411, 418 (1981)).

    In *Demoss*, the Eighth Circuit held, in a case involving Detective Meyer, that a

package shipped via commercial carrier is not seized when it is lifted from a conveyer

belt for an initial inspection. 279 F.3d at 635–36. Similarly here, when Detective Meyer

removed the package from the conveyer belt at 6:29 a.m. and placed it at his feet,

Defendant's "possessory interests" were limited. *Id.* at 635. "By entrusting the package to

FedEx for delivery . . . the sender virtually *guaranteed* that any characteristic of the

package that could be observed by the senses would be so observed. And there was no

legitimate expectation that law-enforcement officers would not be among the observers."

*Id.* (emphasis in original). Any "interference" with the package, moreover, was

"insignificant," as Detective Meyer "held the package only briefly before he observed

additional suspicious characteristics." *Id.* at 635–36. Defendant concedes that there was

no seizure until 6:45 a.m., when Detective Meyer took the package away from the

conveyer belt area and put it in the back of a FedEx delivery truck in order to run Whinny over the package. (Def.'s Mem. 6.)

Thus, the question becomes: "by the time there was a seizure, was there reasonable, articulable suspicion to support it?" *Demoss*, 279 F.3d at 636. At this point, Detective Meyer knew the following: (1) the package was shipped Priority Overnight, which was suspicious for someone to spend so much money to ship candles, and was unusual because in Detective Meyer's experience, Priority Overnight is usually used to ship company-to-company, but this package was being shipped from a company (Candle Craft Center) to a person (Bulow Todd, or as Detective Meyer presumed, Todd Bulow); (2) the package originated from California, considered a "source state" for narcotics; (3) Candle Craft Center appeared to be fictitious, according to Detective Meyer's own Google search and the search efforts of his analyst; (4) Todd Bulow also appeared to be a fictitious person, as the analyst could find no records in Minnesota associated with that name; and (5) the analyst discovered three narcotics investigations associated with the phone number listed on the air bill. Considered alone, each of these facts may appear "innocuous," but "characteristics consistent with innocent use of the mail can, when taken together, give rise to reasonable suspicion." *Demoss*, 279 F.3d at 636. Detective Meyer's experience in the interdiction of packages containing illegal drugs, combined with his observations and the information that he gleaned during his brief investigation, demonstrate that the seizure was supported by reasonable, articulable suspicion. *See United States v. Gomez*, 312 F.3d 920, 924 (8th Cir. 2002) ("The characteristics of the package described by Medrano in his testimony at the suppression hearing . . . when

10

combined with his undisputed knowledge and experience in the interdiction of packages containing illegal drugs, clearly demonstrate that Medrano had formed the reasonable suspicion necessary to detain the package.").

Defendant argues that the facts of the instant case "resemble little" of *Demoss* and another case involving Detective Meyer, *United States v. Lakoskey*, 462 F.3d 965 (8th Cir. 2006).[5] In *Demoss*, when Detective Meyer took the package from the belt, he observed that the "air bill was handwritten (diminishing the likelihood that the package was sent by a business) and that it arrived in Minnesota from a source state [California] for illegal drugs." *Demoss*, 279 F.3d at 635. Then, "as soon as [Detective] Meyer lifted the package, he noticed the heavy perfume smell and the excessive tape on the package, features that, in his experience, were intended to mask the smell of illegal drugs," and "[i]n the time it took him to read the air bill, Meyer further noted the lack of telephone numbers for sender and recipient, the cash payment, and that the package was sent priority overnight." *Id.* at 636. The facts are not perfectly aligned,[6] but the similarities— use of Priority Overnight for a package coming from a source state—are significant when combined with the other factors cited by Detective Meyer to justify seizing the package. Most importantly, the inferences that arise from the various factors cited by Detective Meyer are similar. The handwritten air bill in *Demoss*, for example, diminished the

---

[5]    Defendant asserts that Detective Meyer used these cases as a "template" to "justify his illegal seizure of Mr. Ferguson's package in the same way he had done before." (Def.'s Mem. 3.) There is no basis for this assertion.

[6]    The air bill in this case was computer-generated, not handwritten. (Tr. 28.)

likelihood that the package was sent by a business, and in the instant case, the same inference—perhaps stronger—can be drawn from internet and database research suggesting that Candle Craft Center, purportedly the sender of the package, did not exist.

In *Lakoskey*, the following reasons were given to justify the seizure: (1) the label on the package was handwritten, which diminished the likelihood that the package was sent by a business; (2) the package was sent via Express Mail, which is a more expensive method of shipment that would seldom be used for personal correspondence; (3) the package was sent from Arizona, which is a known drug source state; (4) the return address contained a fictitious name for the address listed; and (5) Postal Inspectors in St. Paul, Minnesota, received a tip from Postal Inspectors in Arizona, instructing them to watch for drug shipments to Todd Lakoskey. 462 F.3d at 976. Here, Defendant emphasizes that Detective Meyer did not have any sort of tip instructing him to watch for drug shipments to a certain recipient. (Def.'s Mem. 12.) This is true, but other facts not present in *Lakoskey* must also be considered, such as internet and database research suggesting that the sender and recipient were fictional and the analyst's report that the phone number was associated with drug investigations. Defendant argues that Detective Meyer did not have a sufficient basis to determine that the sender did not exist because he did not know the type of database or the precise search term used by his analyst. (Def.'s Mem. 9–10.) The analyst's report, however, provided more than enough evidence for Detective Meyer to reasonably suspect that the sender was a made-up entity. Defendant also argues that the search for "Todd Bulow" instead of "Bulow Todd" was misguided because Todd can be a last name. (*Id.* at 10.) Todd is a more likely first name than

Bulow, so it was not unreasonable to presume that the shipping label had listed the last name before the first name. Ultimately, Defendant's attempt to ascribe potentially innocent explanations to each of the factors cited by Detective Meyer belies the "totality of the circumstances" approach that courts are directed to employ when analyzing reasonable suspicion. *See United States v. Logan*, 362 F.3d 530, 533 (8th Cir. 2004) ("Reasonable suspicion exists when, based on the totality of the circumstances, an officer possesses a particularized and objective basis for suspecting that the package contains contraband, that is, more than an inchoate and unparticularized suspicion or hunch.").[7]

Next, the Court must consider whether the subsequent detention of the package for the canine sniff was an unreasonable intrusion upon Defendant's privacy interests. "A seizure properly supported by reasonable suspicion may by its 'nature and extent' cross over to become an unreasonable intrusion upon Fourth Amendment rights, in which case the detention would be unconstitutional in the absence of probable cause." *Gomez*, 312

---

[7]    Defendant also cites *United States v. Johnson*, 171 F.3d 601, 604 (8th Cir. 1999), where a package was seized because the labels were hand-written, the package was mailed from one individual to another individual at the same address, the package was mailed from a narcotics source state, and the return address zip code was different from the accepting zip code. The court found that these facts did not support a finding of reasonable suspicion, but this was because the record lacked "a description of Inspector Vajgert's inferences, or deductions from his experience," as the inspector "did not testify at the suppression hearing, and his affidavit did no more than state that he had eight years of experience as a postal inspector along with some training courses, and that the package in question met the Express Mail/Narcotics Profile." *Id.* Here, by contrast, Detective Meyer articulated his thought process at the suppression hearing. *Id.* ("[T]he Fourth Amendment requires an officer to explain *why* the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed.") (emphasis in original).

F.3d at 925. Detective Meyer testified that he removed the package from the conveyer belt at approximately 6:29 a.m. and then placed it on a FedEx truck at approximately 6:45 a.m., at which point it was seized for Fourth Amendment purposes. (Tr. 15–16.) It is not entirely clear how much time passed between the seizure at 6:45 a.m. and the canine alert, but it couldn't have been more than a few minutes; Detective Meyer testified that the search warrant was issued at 9:30 a.m., "about two hours and 45 minutes . . . from the time the dog alerted to the time you got the warrant." (Tr. 20.) This demonstrates that Detective Meyer "diligently pursued" his investigation into the package, and as a result, the nature and extent of the seizure was reasonable. *See Demoss*, 279 F.3d at 636 (stating that detention for twenty minutes "[u]p to the time of the dog's alert, which provided the necessary probable cause to detain the package while a search warrant was sought, . . . was wholly reasonable").

### B.    The Search Warrant Was Supported by Probable Cause

Probable cause, as it relates to a search, "is a fair probability that contraband or evidence of a crime will be found in the location searched." *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996). "The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

It is well-established that a positive alert by a canine can provide the probable cause required to conduct a search. *See United States v. Mathews*, 784 F.3d 1232, 1235 (8th Cir. 2015) ("[T]he positive alerts from those sniffs alone provided probable cause to issue the search warrant."); *United States v. Bowman*, 660 F.3d 338, 345 (8th Cir. 2011) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present."). A court can "presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search" if "a bona fide organization has certified a dog after testing his reliability in a controlled setting . . . [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (citing *Florida v. Harris*, 568 U.S. 237, 246–47 (2013)). "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Id.* (citing *Harris*, 568 U.S. at 247).

Detective Meyer testified that Whinny is certified by the United States Police Canine Association to detect narcotics, including marijuana, cocaine, crack, heroin, methamphetamine, ecstasy, mushrooms, and opium. (Tr. 17–18, 22; Gov't Exs. 6–8.) Detective Meyer also testified about the nature of the certification test, which is timed and involves drug hides in cars and rooms in a house (Tr. 22, 34); that Whinny's reliability is above average, as she is generally able to find narcotics and not falsely alert

15

(Tr. 23); that Whinny's mistakes are "within an acceptable tolerance" (Tr. 24); and that Whinny has not had long-term or chronic falsing issues with parcels. (Tr. 45.) Defendant focuses heavily on Detective Meyer's attempt to mitigate the possibility of a false alert by touching other boxes, characterizing Whinny as being "prone to alert to her handler's scent," (Def.'s Mem. 15), but as Detective Meyer testified, this was due to handler error, and in past instances, the issue was resolved when the handler touched other boxes. (Tr. 37 ("[W]e had Frank touch ten more boxes and there wasn't an issue.").) Defendant claims that the subject package was "the most contaminated, given his way of handling it prior to the dog sniff," i.e., carrying and handling it without gloves. (Def.'s Mem. 15.) Again, Detective Meyer resolved this issue by touching other boxes, and there is no basis to suggest that a box can be more or less contaminated based on the amount of time or the manner in which a package is touched. Thus, "all of the facts surrounding [the] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Gonzalez*, 781 F.3d at 430.

"A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). In addition to explaining the circumstances of Whinny's positive alert (and that she is certified to detect the odor of narcotics, including methamphetamine), Detective Meyer's affidavit also outlines the suspicious characteristics of the package, discussed above, which he averred are "consistent with

previous packages" he has "found to contain illegal substances." (Gov't Ex. 2 at 2.)[8]

Thus, a "four corners" review of the affidavit clearly demonstrates the existence of

probable cause. *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) ("When

the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only

that information which is found within the four corners of the affidavit may be considered

in determining the existence of probable cause.").

---

[8]     The affidavit states, in pertinent part, as follows:

  . . . With your affiants 19 years of training and experience in working
parcel interdiction, I found the following suspicious:

1.  The 16 lbs Fed-Ex package was sent from Torrence, CA. California is a
source state for narcotics.

2.  Your affiant has found hundreds of parcels containing narcotics sent
from the State of California in the past.

3.  The package was sent via air service. Drug couriers use the Air Service
because the narcotics will be in the system a shorter time. Air service is
very expensive.

4.  According to law enforcement database, the Sender company, Candle
Craft Center, does not exist.

5.  According to law enforcement database, the recipient Todd Bulow does
not exist in the state of Minnesota.

6. According to law enforcement database, the recipients phone number
comes back to a person named Odain Ferguson . . . . This number
references to three other drug investigations in the past.

(Gov't Ex. 2 at 2.)

### C. The Good Faith Exception Applies if the Warrant Was Not Supported by Probable Cause

Evidence obtained in violation of the Fourth Amendment is admissible if the officers executing an invalid search warrant did so in good faith. *United States v. Ortiz-Cervantes*, 868 F.3d 695, 702 (8th Cir. 2017) (citing *Leon*, 468 U.S. at 918–19). "Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). The good-faith exception does not apply in a variety of circumstances, including where the supporting affidavit includes "a false statement made knowingly and intentionally or with reckless disregard for the truth" to mislead the issuing judge—a violation of *Franks v. Delaware*, 438 U.S. 154 (1978). *Proell*, 485 F.3d at 431 (citing *Leon*, 468 U.S. at 923).

Defendant requested a *Franks* hearing in his initial motion papers. (Doc. No. 20, Def.'s Pretrial Mot. to Suppress Search and Seizure ("Def.'s Pretrial Mot.") 2.) Defendant argues that there was a *Franks* violation because Detective Meyer failed to include information about Whinny's false-alert issues and his conduct in touching the package. (Def.'s Mem. 19.) To challenge a search warrant under *Franks*, Defendant must make a "substantial preliminary showing that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth." *United States v. El-Alamin*, 574 F.3d 915, 924–25 (8th Cir. 2009). A "mere allegation, standing alone without an offer of proof in the

form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *Id.* (citing *Franks*, 438 U.S. at 171).

In *Sundby*, for example, the defendant argued that the "sole basis for probable cause is the alert by the dog," and "[n]othing is offered in the affidavit . . . other than the dog is narcotics trained and certified. No information is offered about continued training, continued certification, reliability, or error rates for [the dog]." 186 F.3d at 874. The Eighth Circuit rejected this argument because to "establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education." *Id.* at 876. In this case, Detective Meyer's affidavit states that Whinny "is certified by the United States Police Canine Association to detect the odors of methamphetamine, cocaine, crack cocaine, mushrooms, marijuana, ecstasy, opium and heroin," and that after checking parcels on three trucks, Whinny went to a fourth truck, "sniffed the suspect parcel . . . and sat. This is Whinny's alert for the odor of narcotics emitting from this parcel." (Gov't Ex. 2 at 1–2.) Thus, the affidavit "set forth enough facts to support a reasonable belief that the package probably contained drugs." *Sundby*, 186 F.3d at 876.

Further, the defendant in *Sundby* requested a *Franks* hearing, but the court found that he "did not make the showing required to obtain one." *Id.* In other words, the defendant's argument in *Sundby* that the affiant failed to include information about the dog's track record was not to enough to justify an inquiry into whether the affidavit was based on information that "the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923 (citing *Franks*); *see*

19

*also Gonzalez*, 781 F.3d at 431 ("[R]eckless disregard for the truth may be inferred from the fact that information was omitted," but "this inference is valid only when the defendant shows that the omitted material would be clearly critical to the finding of probable cause."). Similarly here, Defendant did not make the substantial preliminary showing that is required to demonstrate entitlement to a *Franks* hearing. The good-faith exception applies, and the officers' reliance on the search warrant was objectively reasonable.

## RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 20) be **DENIED**.

Date: November 28, 2017.             *s/ Becky R. Thorson*_____
                                     BECKY R. THORSON
                                     United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).