# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

GADELLE DANTE FERGUSON,

Defendant.

Criminal No. 17-204 (JRT/BRT)

**MEMORANDUM OPINION
AND ORDER ADOPTING REPORT
AND RECOMMENDATION**

---

Gregory G. Brooker and Thomas Calhoun-Lopez, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

Shannon R. Elkins, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendant.

Defendant Gadelle Dante Ferguson has been charged with two counts of possession with intent to distribute methamphetamine. He moved to suppress the contents of a FedEx package that was mailed to him and seized by Minneapolis-St. Paul Airport Police Detective Mark Meyer. Magistrate Judge Becky R. Thorson held a hearing on Ferguson's motion and issued a report and recommendation ("R&R") recommending that the motion be denied because Meyer had reasonable suspicion to seize the package, the search warrant was supported by probable cause, and – even if the warrant were not supported by probable cause – the good-faith exception applies. Presently before the Court are the R&R and Ferguson's Objections to the R&R. Because Meyer had reasonable articulable suspicion to seize the package and probable cause

supported a subsequent search warrant, the Court will overrule Ferguson's Objections, adopt the Magistrate Judge's R&R, and deny Ferguson's Motion to Suppress.

## BACKGROUND

### I.     FACTUAL BACKGROUND

Meyer testified to the following facts at a hearing before the Magistrate Judge on October 3, 2017. (*See generally* Mot. Hr'g Tr. ("Tr."), Oct. 16, 2017, Docket No. 30.)

### A.     Parcel Intercept at Minneapolis-St. Paul Airport

On April 28, 2017, Meyer was stationed at the airport watching in-bound parcels at FedEx. (*Id.* at 8.) With the goal of catching incoming narcotics, Meyer was "looking for mainly air parcels, Priority Overnight, person to person." (*Id.* at 9.) At about 6:29 A.M., a package caught his attention because it was shipped Priority Overnight, which cost approximately $188, and appeared to be going to a residence. (*Id.* at 10-11, 15.) Meyer thought it was unusual that the package was going to a residence, because Priority Overnight is expensive and usually used to ship "company to company." (*Id.* at 11-12.) The package was shipped from "Candle Craft Center," which Meyer assumed was a company, to "Todd Bulow" or "Bulow Todd," which Meyer assumed was an individual. (*Id.* at 11.) Meyer thought it odd that someone would have needed candles so quickly that they would pay for Priority Overnight shipping. (*Id.* at 12.) He also thought the package was suspicious because it came from Torrance, California; he considered Torrance a "hot spot for narcotics" and California a "source state." (*Id.* at 12-13.)

Meyer performed a Google search for "Candle Craft Center," which returned no results. (*Id.* at 12.) He then took a picture of the air bill and texted it to an analyst that was working for the airport police. (*Id.* at 13.) The analyst searched a database called CLEAR and a California business database and told Meyer that Candle Craft Center did not exist. (*Id.* at 14.) The analyst then looked up "Todd Bulow" and found no result in Minnesota. (*Id.*) Finally, the analyst searched the phone number below the recipient's address on the air bill and reported that it was tied to three narcotics investigations, although he did not say how it was related to those investigations. (*Id*. at 14-15.)

At approximately 6:45 A.M., Meyer took the package and placed it in a FedEx truck. (*Id.* at 16.) He touched other boxes on that truck, as well as several boxes in two or three other FedEx trucks. (*Id.*) He touched the boxes with various parts of his body, including his hands, his thigh, and the back of his arm. (*Id.* at 32.) Meyer intended to run his narcotics K-9, Whinny, on the boxes. (*Id.* at 7, 16.) He touched multiple boxes because he did not want Whinny to "key off of [his] scent." (*Id.* at 16-17.) Meyer testified: "I don't want my odor only on one box because [Whinny] may . . . smell my odor on just that one box and not on any of the others and she may alert." (*Id.* at 17.)

Meyer then had Whinny "run the boxes." (*Id.*) Meyer ran Whinny through several trucks where he had touched boxes; each truck contained ten to fifteen boxes. (*Id.* at 32, 46.) When they arrived at the fourth truck, Whinny alerted to the package at issue by going into a "sit." (*Id.* at 17, 46.) Meyer wrote out a receipt to FedEx for the box and brought the box back to his office. (*Id.* at 18.) He then applied for a search

warrant, which issued at 9:30 A.M.  (*Id*. at 18, 20.)  Meyer opened the FedEx box with his sergeant and lieutenant, and they found methamphetamine inside.  (*Id*. at 20-21.)

### B.    Meyer and Whinny's Background and Training

Meyer has worked with the airport police since 1990, became a narcotics K-9 handler in 1997, and became a K-9 trainer in 2005.  (*Id*. at 4-5.)   He has been trained in handling K-9s and in narcotics interdiction.   (*Id*. at 5-6.)   He also teaches parcel interdiction and trains law enforcement agencies in the use of K-9s.  (*Id*. at 6, 23.)  Meyer has handled four dogs since becoming a K-9 handler and has been handling Whinny for about three years.  (*Id*. at 7-8.)

Whinny is certified by the United States Police Canine Association to detect narcotics, including marijuana, cocaine, crack, heroin, methamphetamine, ecstasy, mushrooms, and opium.  (*Id*. at 17-18.)   Whinny has been consistently certified since 2015.  (*Id*. at 22-23.)   Certification involves showing that the dog can find narcotics hidden in several locations inside a house and in several cars during a timed test that lasts less than 30 minutes.  (*Id*. at 22, 40.)  In Meyer's opinion, Whinny's reliability is above average because she is generally able to find narcotics and generally does not falsely alert.  (*Id*. at 23.)  She has falsely alerted in the past, as do all narcotics dogs, but Meyer opines that Whinny's false alerts are "within an acceptable tolerance."   (*Id*. at 24.)  Whinny's errors are not reported to certification authorities; Meyer is the only person who keeps track of them.  (*Id*. at 35-36.)  In the past, she has given false indications on boxes touched by Meyer or another handler.  (*Id*. at 36-37.)  She falsely reported on a box

touched by another handler in January of 2017, which Meyer attributed to "handler error." (*Id.* at 37.)  Whinny also had about a month of false reporting problems in May of 2016. (*Id.* at 38.)  Meyer noted that these issues were with "hides," or hidden locations in a room, not parcels. (*Id.* at 44-45.)  Meyer opined that Whinny has never had long-term or chronic false alerting with parcels. (*Id.* at 45.)

## II.    PROCEDURAL BACKGROUND

Ferguson was charged on July 18, 2017, with two counts of possession with intent to distribute methamphetamine.  (Compl. at 1, July 18, 2017, Docket No. 1.)  On September 11, he moved to suppress the contents of the FedEx package seized by Meyer. (Mot. to Suppress, Sept. 11, 2017, Docket No. 20.)  Ferguson's Motion alleged that: (1) he had a reasonable expectation of privacy in the package; (2) law enforcement lacked probable cause to seize and search the package; (3) the "dog alert" did not justify the continued detention of the package because the dog was not reliable; (4) without the "dog alert," Meyer lacked probable cause to support a search warrant; and (5) Ferguson was entitled to a hearing to challenge the validity of the search warrant. (*Id.* at 1-2.)

The Magistrate Judge held a hearing on the Motion to Suppress on October 3, and Meyer testified to the facts surrounding the search and seizure of the package.  (*See generally* Tr.)  The Magistrate Judge recommends that Ferguson's Motion to Suppress be denied because Meyer had reasonable suspicion to seize the package, probable cause supported the search warrant, and – even if the warrant were not supported by probable cause – the good-faith exception applies.  (R&R at 8, 14, 18, 20, Nov. 29, 2017, Docket

No. 36.)  Ferguson objects to the R&R, arguing that Meyer lacked reasonable articulable suspicion to seize the package, that Meyer lacked probable cause to justify searching the package, that the good-faith exception does not apply, and that the evidence should be suppressed.  (Objs. at 6, 16, 24, Dec. 20, 2017, Docket No. 39.)  The Government filed a response to Ferguson's Objections.  (Response, Jan. 3, 2018, Docket No. 41.)

## DISCUSSION

### I.     STANDARD OF REVIEW

Upon the filing of an R&R by a magistrate judge on a motion to suppress, "a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. §636(b)(1).  "The district judge must consider de novo any objection to the magistrate judge's recommendation."  Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1).  "The objections should specify the portions of the magistrate judge's [R&R] to which objections are made and provide a basis for those objections."  *Nayer v. Walvatne*, No. 07-1958, 2009 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).

### II.     REASONABLE SUSPICION FOR SEIZURE

Ferguson objects to the Magistrate Judge's finding that Meyer had reasonable suspicion to seize the package.  He argues that the R&R refused to examine the explanations provided by Meyer, that some of the information available to Meyer at the time of the seizure negated the presence of contraband, and that the totality of the

circumstances could not have suggested to Meyer that the package contained contraband. Because the totality of the circumstances supports a finding of reasonable suspicion of criminal activity, the Court will overrule Ferguson's Objections and adopt the R&R.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. This protection extends to packages sent by mail. *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970)). "Law enforcement authorities must possess a reasonable suspicion based on articulable facts that a package contains contraband before they may detain the package for investigation." *Id.* Reasonable suspicion is a totality of the circumstances test and exists when "an officer possesses a 'particularized and objective basis' for suspecting that the package contains contraband, that is, more than an 'inchoate and unparticularized suspicion or "hunch."'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Where there is "[c]onduct typical of a broad category of innocent people," there is only a "weak basis for suspicion." *Id.* (quoting *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992)) (alteration in original).

Reasonable suspicion can be established by "facts which, alone and to an untrained eye, appear innocuous, but which, to a trained officer familiar with the methods of drug traffickers are sufficient." *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004). However, "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Johnson*, 171 F.3d at 603-04 (quoting *United States v. Beck*, 140 F.3d

1129, 1137 (8th Cir. 1998)).  Furthermore, "[t]he officer must be able to explain the basis of her suspicion." *Smith*, 383 F.3d at 704.

The parties agree that the package was seized when Meyer moved it from the conveyor belt and placed it in the back of the FedEx delivery truck.  Thus, the issue is whether Meyer had reasonable and articulable suspicion to justify the seizure at that moment.  When Meyer moved the package to the back of the FedEx delivery truck, he knew the following: (1) the package was shipped Priority Overnight; (2) Priority Overnight for a package that size and weight cost around $188; (3) the package was shipped from a purported business, Candle Craft Center, to a residence, Bulow Todd (or Todd Bulow); (4) the package came from Torrance, California, a hot spot for drugs in a source state; (5) a law enforcement analyst could not find Candle Craft Center in at least two databases, and a Google search of the company name returned no results; (6) a law enforcement analyst could not find a Todd Bulow in Minnesota; and (7) the phone number listed under the receiver's address was linked in some way to three narcotics investigations.  Viewed in combination, these factors supported a reasonable articulable suspicion that the package contained narcotics and justified Meyer's seizure.

Several cases are instructive here.  In *Smith*, the Eighth Circuit found reasonable suspicion where a package was sent from California in a Sony cordless telephone box, had an air bill that was handwritten, was shipped via overnight delivery and marked for optional Saturday delivery, had a visibly corrected error in the sender's address, and whose shipping was paid for in cash.  383 F.3d at 704.  The court found that these observations, coupled with the officer's experience, were sufficient to create reasonable

suspicion. *Id.* at 704-05. First, the officer knew that California was a drug source state. *Id.* at 704. Second, she knew that the telephone was commonly available throughout the United States and was "suspicious as to why someone would choose to ship one via FedEx, especially given the high cost of overnight and Saturday delivery—approximately $35 for shipping versus approximately $60 for the phone." *Id.* Third, she knew that "drug traffickers commonly use overnight and Saturday delivery to minimize the amount of time illicit materials are subject to investigation by the shipping company." *Id.* Fourth, "[s]he knew that drug traffickers commonly wait until the last possible moment to address packages containing drugs by hand to reduce the likelihood that the recipient's address will be discovered if the shipper is stopped by a law enforcement officer" and found it "suspicious that a sender would make an error in writing his or her own address." *Id.* Fifth and finally, she knew that "drug traffickers often pay for shipping in cash." *Id*.

Because the Eighth Circuit found that these observations and conclusions were sufficient to create reasonable suspicion, Meyer's observations and conclusions here were also sufficient. The first three factors are nearly identical. First, like the officer in *Smith*, Meyer noted that the package came from a drug source state. Second, Meyer noted that the package was shipped priority overnight from a business to a residence, and Meyer found it suspicious that someone would pay such costly shipping – approximately $188 – to receive candles overnight. Third, Meyer was on the lookout for parcels shipped Priority Overnight and found it unusual that expedited shipping would be used to send a package to a residence because expedited shipping is usually used to send packages company-to-company. While each of these factors **could** be "consistent with innocent"

activity, *United States v. Sokolow*, 490 U.S. 1, 9 (1989), viewed alongside the other factors in this case, they contribute to reasonable suspicion.

The remaining factors in *Smith* are not present here, as the label on the package Meyer seized was not handwritten, there was no visibly corrected error in the label, and there was no indication that the package was paid for in cash. Nevertheless, several factors were present here that were not present in *Smith*.

First, neither a Google search nor a search by a law enforcement analyst returned results for a Candle Craft Center in California. Ferguson argues that Meyer "did not have a sufficient basis to conclude that [Candle Craft Center] did not exist" because he did not have any knowledge of the types of databases that his partner had used to look up the term or which term was used for the search. (Objs. at 11.) But Meyer also did his own Google search for the company, which returned no results. While this factor in and of itself would not be sufficient to sustain a finding of reasonable suspicion, coupled with the other factors and Meyer's knowledge and experience, it supports a finding of reasonable suspicion. As Ferguson himself notes, "even when each factor cited by law enforcement to support a seizure is 'not by itself proof of any illegal conduct and is quite consistent with innocent' activity, the sum of the factors taken together can amount to reasonable articulable suspicion." (Objs. at 8 (quoting *Sokolow*, 490 U.S. at 9).)

Second, the analyst could not find a Todd Bulow in Minnesota. Ferguson argues that the search of the recipient's name was "misguided and provided no helpful information to indicate a connection between the package and contraband." (Objs. at 12.) He argues that "it is perplexing why Officer Meyer elected to use, not the name printed

on the shipping label, but its reversed version" and suggests that "[i]t is almost as if [Meyer] did not want the search to yield any results." (Objs. at 12-13.) The results of this search are not necessary to sustain a finding of reasonable suspicion. Even ignoring this factor, there was reasonable suspicion to justify seizure of the package.

Third and finally, the phone number on the air bill was linked to three narcotics investigations. Ferguson argues that "the simple fact that the printed recipient's telephone number was associated with three narcotics investigations in unknown fashion did not establish a logical connection between the package and narcotics or other contraband." (Objs. at 13.) Just because this factor **could** be consistent with innocent activity does not mean that it cannot contribute to reasonable suspicion. The Court need not "rule out the possibility of innocent conduct." *United States v. Terriques*, 319 F.3d 1051, 1057 (8th Cir. 2003) (quoting *Untied States v. Arvizu*, 534 U.S. 266, 276 (2002)). The Court views the totality of the circumstances, "some of which may seem innocent in isolation." *Id.*

While none of these many observations alone would constitute reasonable suspicion, taken together – and coupled with Meyer's "concrete reasons" for finding them suspicious, *Johnson*, 171 F.3d at 604 (quoting *Beck*, 140 F.3d at 1137) – they rise beyond an "inchoate and unparticularized suspicion or 'hunch,'" *Terry,* 392 U.S. at 27, and create reasonable articulable suspicion.

Likewise, in *United States v. Logan*, the Eighth Circuit found reasonable suspicion where: "(1) the package was shipped from Los Angeles, a drug source city; (2) the package was shipped to St. Louis, a drug target city; (3) the package was shipped from a

CMRA [commercial mail receiving agency]; (4) the package was shipped second-day air delivery; (5) the package was shipped to a CMRA; and (6) the name and address of the recipient were handwritten." 362 F.3d 530, 533 (8th Cir. 2004). While the court noted that, "[e]ach of these factors, when considered alone, is consistent with innocent mail use," the factors created reasonable suspicion "[w]hen viewed in the aggregate by a trained law enforcement officer." *Id.* at 533-34. The only difference between *Logan* and the present case is the fact that, in *Logan*, the package was shipped to a CMRA and that the label was handwritten. These factors are not dispositive, and there are sufficient additional factors in the present case to constitute reasonable suspicion.

Two additional Eighth Circuit cases involving Detective Meyer are significant in this case. In *United States v. Demoss*, the Eighth Circuit found reasonable suspicion where: (1) the air bill was handwritten, which diminished the likelihood that it was sent by a business; (2) the package came from California, a source state; (3) the package gave off a heavy perfume smell and contained excessive tape, features which, in Meyer's experience, were intended to mask the smell of drugs; (4) there were no telephone numbers listed for sender and recipient; (5) shipping was paid in cash; and (6) the package was sent priority overnight. 279 F.3d 632, 635-36 (8th Cir. 2002). The facts of the present case are similar. While the air bill here was not handwritten, the fact that neither a Google search nor a search of databases by a law enforcement analyst returned a result for Candle Craft Center likewise diminished the likelihood that the package was sent by a business. The package also came from California, a source state, and was sent priority overnight. While there was a telephone number listed for the recipient in the

present case, the number was linked to several narcotics investigations, giving Meyer an

additional reason to suspect narcotics.   While not a perfect fit, the present facts are

sufficiently similar to *Demoss*, and Meyer had reasonable suspicion to justify the seizure.

In another case involving Meyer, the Eighth Circuit again found reasonable and

articulable suspicion based on facts similar to the present case:

> (1) the label on the package was handwritten, which
> diminished the likelihood that the package was sent by a
> business; (2) the package was sent via Express Mail, which is
> a more expensive method of shipment that would seldom be
> used for personal correspondence; (3) the package was sent
> from Arizona, which is a known drug source state; (4) the
> return address contained a fictitious name for the address
> listed; and (5) Postal Inspectors in St. Paul, Minnesota,
> received a tip from Postal Inspectors in Arizona, instructing
> them to watch for drug shipments to [the recipient].

*United States v. Lakoskey*, 462 F.3d 965, 976 (8th Cir. 2006) (as amended on reh'g (Oct.

31, 2006)).   Two central facts differ between *Lakoskey* and the present case: (1) the

package in *Lakoskey* appeared to be sent between individuals, and (2) the officers had

been told by postal inspectors to watch for drug shipments to the recipient.   But the

inferences logically drawn from these facts do not differ from the inferences logically

drawn in the present case.   Meyer had reason to doubt that the package he seized was sent

by a business because both a Google search and a search of two databases by a law

enforcement analyst returned no results.   Furthermore, while Meyer did not have a tip for

the specific recipient listed on the parcel, he knew that the number listed on the parcel

was associated with three narcotics investigations, thus he reasonably drew a similar

inference.   In light of *Lakoskey*, Meyer had reasonable suspicion to seize the package.

-13-

Ferguson cites two cases where the Eighth Circuit found that the totality of the circumstances did not amount to reasonable and articulable suspicion to justify seizure of a parcel. In the first case, *United States v. Vasquez*, the package "was incorrectly addressed even though the sender and recipient had the same last name; the air bill was handwritten, marked 'priority overnight,' and contained no account number; and the package was sent from California." 213 F.3d 425, 426 (8th Cir. 2000). The circumstances of the present case rise beyond those in *Vasquez* and are more similar to *Demoss* and *Lakoskey*. In the second case, *Johnson*, "the labels were hand-written, the package was mailed from one individual to another individual at the same address, the package was mailed from a narcotics source state, and the return address zip code was different from the accepting zip code." 171 F.3d at 604. Again, the circumstances in the present case rise beyond those in *Johnson* and are more similar to *Demoss* and *Lakoskey*.[1]

While Ferguson correctly points out that each of Meyer's observations, viewed in isolation, may have had an innocent explanation, the Court need not "rule out the

---

[1] The court in *Johnson* noted that law enforcement officers are permitted to draw inferences, but that those deductions must be explained, and the record "wholly lack[ed] a description of [the officer's] inferences, or deductions from his experience." 171 F.3d at 604. Ferguson objects to the R&R's interpretation of this case, noting that the court "went on to consider the significance of the articulable suspicion factors as if some conceivable 'inferences' were provided for them." (Objs. at 15.) The *Johnson* court held that "these particularized facts, none of which is **inherently** suspicious, do not constitute reasonable suspicion of criminal activity, even considered together." *Id.* at 605 (emphasis added). But the court immediately followed by saying that "the record does not contain any particularized assessment of their significance for purposes of determining reasonable suspicion," *id.*, suggesting that the court's analysis might have been different had the record contained a description of the officer's inferences. Ultimately, Ferguson's objections have no bearing on *Johnson*'s application to this case because – irrespective of how one interprets the holding in *Johnson* – the facts of the present case rise well beyond those of *Johnson*.

**possibility** of innocent conduct." *Terriques*, 319 F.3d at 1057 (emphasis added) (quoting *Arvizu*, 534 U.S. at 276). The Court views the totality of the circumstances, which considers the aggregate of the observations and inferences made by law enforcement. *Id.* Here, the sum of Meyer's observations and his specifically articulated inferences support a reasonable articulable suspicion of criminal activity. Thus, Meyer's seizure of the package was justified and did not violate Ferguson's Fourth Amendment rights. The Court will therefore overrule Ferguson's Objections, adopt the Magistrate Judge's R&R, and deny Ferguson's Motion to Dismiss.

### III.    PROBABLE CAUSE FOR SEARCH WARRANT

Ferguson objects to the Magistrate Judge's finding that the warrant to search the package was supported by probable cause. He argues that Whinny's examination and alert to the package could not support probable cause for the issuance of the search warrant, thus the search of the package was a violation of his Fourth Amendment rights.

A search warrant must be based upon a finding that there is probable cause to believe that evidence of a crime will be found in the place searched. *See United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007). Probable cause to issue a search warrant is based on totality of the circumstances and "exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence of' criminal activity will be found in the particular place to be searched." *United States v. Davis*, 471 F.3d 938, 946 (8th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). A reviewing court should accord "great deference" to

a determination of probable cause. *Gates*, 462 U.S at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The reviewing court must ensure only that there was "a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Id*. at 236 (alteration and omission in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

The Eighth Circuit has held that "a dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *Untied States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (collecting cases); *see also United States v. Mathews*, 784 F.3d 1232, 1235 (8th Cir. 2015); *United States v. Bowman*, 660 F.3d 338, 345 (8th Cir. 2011). As to reliability, "a court can presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search" where "a bona fide organization has certified a dog after testing his reliability in a controlled setting . . . [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015) (alterations and omission in original) (quoting *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)). A defendant can overcome this presumption by showing "the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Id.*

The parties do not dispute that Whinny is certified by the United States Police Canine Association to detect narcotics, including methamphetamine. Thus, the Court presumes that Whinny's alert provided probable cause to search. The question is whether Ferguson has overcome this presumption. He has not. Ferguson does not contest the

adequacy of Whinny's certification program.  He instead focuses on the "problematic nature of the procedure involved" and alleges that "Whinny was prone to make false alerts when the subject package had been handled by her handler."  (Objs. at 17.)

Regarding the procedure, Ferguson essentially argues that, because Meyer did not use gloves, the package in question was contaminated with his scent.  (*Id.* at 17-18.) Even though Meyer touched other boxes, Ferguson argues that the subject package was the "most contaminated" because it was handled more than the other boxes that he touched.  (*Id.* at 18.)  The Magistrate Judge found that "there is no basis to suggest that a box can be more or less contaminated based on the amount of time or the manner in which a package is touched."  (R&R at 16.)  Ferguson argues that common sense tells us the opposite: that "an object becomes more contaminated with an odor the **longer** or **closer** it is in contact with the odor."  (Objs. at 18.)  This dispute is not dispositive.[2]

---

[2] Moreover, the issue of how "contaminated" a box is would likely require expert testimony or scientific analysis to be fully explored.  But the Court presumes the canine's alert to be reliable unless the defendant can overcome that presumption, and no evidence or testimony was introduced to suggest that Meyer's handling of the box made it more "contaminated" than the others.

Ferguson argues that Meyer conceded through his testimony in *Lakoskey*, 462 F.2d at 970, that longer or closer contact with an odor makes an object more contaminated.  (Objs. at 18.)  The facts of *Lakoskey* are not aligned with this case.  There, Meyer's canine did not alert to a package on first sniff.  *Id.*  Meyer then placed the package "in a compartment in [his] television room and closed the door . . . for five to ten minutes."  *Id.*  When the canine was brought in to sniff again, she alerted.  *Id.*  Meyer explained that "the positive sniff resulted because the closed environment concentrated the odor of the narcotics."  *Id.* at 970-71.  The amount of odor emanating from the contents of a package after placing it in a closed environment is a different question from the amount of odor emanating from a package's exterior after more extensive handling.  *Lakoskey* is insufficient to support an inference of more "contamination" here.

-17-

While there is some evidence that Whinny had falsely alerted based on Meyer or another handler's scent in the past, Meyer testified that touching other boxes fixed the problem. (Tr. at 36-37 ("[W]e had Frank touch ten more boxes and there wasn't an issue.").)  The fact that Meyer used a procedure that he knew had prevented false alert problems in the past suggests that there was nothing improper about the procedure as performed on April 28, 2017.  Ferguson has not overcome the presumption of reliability of Whinny's alert.[3]

Ferguson also fails to overcome the presumption of reliability of Whinny's alert based on her "false-alert issue."  Meyer testified that Whinny's reliability is "above average" because Whinny is generally able to find narcotics and not falsely alert, and that her mistakes are "within an acceptable tolerance."  (Tr. at 23-24.)  While Ferguson pointed to a few issues with false alerts and some "falsing issues" that lasted about a month in May of 2016, Meyer reported that those issues were worked out.  He also noted that the month-long falsing issue was not related to parcels and attributed it to handler

---

[3] Ferguson cites several cases finding that "[h]andlers' cues, such as voice or other signals, have been recognized to compromise a dog's objectivity and impermissibly lead the dog to alert at the suspected item or person."  (Objs. at 20.)  But there is no evidence that Meyer improperly cued Whinny using hand or other signals in this case, thus these cases do not change the Court's analysis.  Ferguson also cites a research article discussing how drug dogs' performances can be affected by handlers' beliefs, arguing that "Meyer's unreasonable suspicion that the package contained contraband might also have affected the reliability in Whinny's alert." (*Id.* (citing Lisa Lit et al., *Handler Beliefs Affect Scent Detection Dog Outcomes*, 14 ANIMAL COGNITION 387, 388 (2011)).)  While this research calls into question the reliability of canine alerts generally, the Eighth Circuit and the Supreme Court have foreclosed this argument by consistently holding that reliable canine alerts provide probable cause to search, and that reliability is presumed based solely on certification by a bona fide organization.  *See Gonzalez,* 781 F.3d at 429; *Harris*, 568 U.S. at 246-47.  In fact, in *United States v. Rhee*, a district court considered Dr. Lit's article and expert testimony but ultimately found that "[t]he Supreme Court's decision in *Harris* has largely cut the legs out from under [defendant's] position."  No. 3:12CR2, 2014 WL 2213079, at *3 (N.D. Ohio May 28, 2014).

error.  Meyer reported that Whinny has not had long-term or chronic falsing issues with parcels.  Ferguson's evidence of Whinny's falsing issues is not sufficient to overcome the presumption of reliability that stems both from Whinny's certification and training and from the totality of the circumstances surrounding her alert.

Whinny's positive alert alone would have been enough to establish probable cause for the search warrant.  But the issuing judge in this case had more.  Meyer's affidavit outlined the observations he had made about the package, which the Court has determined were sufficient to create reasonable suspicion.  Thus, Meyer's observations and the dog sniff together provided more than "a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  *Gates*, 462 U.S at 236 (quoting *Jones*, 362 U.S. at 271).

## IV.     GOOD-FAITH EXCEPTION

Finally, Ferguson objects to the Magistrate Judge's finding that the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897, 922 (1984), applies in this case.  Evidence obtained as the result of the issuance of a warrant unsupported by probable cause is generally inadmissible, but there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid."  *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *Leon*, 468 U.S. at 922).  Ferguson argues that the good-faith exception does not apply under *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001).  In *Marion*, the Eighth Circuit set forth four circumstances in which *Leon*'s good-faith exception does not apply, including when the

issuing judge "was misled by statements made by the affiant that were false or made 'in reckless disregard for the truth.'"  *Id.* (quoting *United States v. Taylor*, 119 F.3d 625, 629 (8th Cir. 1997)).  Ferguson alleges that Meyer acted with reckless disregard for the truth because he had "obvious reasons to doubt the accuracy of the information he reported" in the application for the warrant.  (Objs. at 23 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)).)

Because the warrant was supported by probable cause, and therefore valid, the Court need not reach this issue.  Nevertheless, were the Court to reach this issue, it would find that *Leon*'s good-faith exception applies here.  Meyer testified that he believed Whinny to be above average in terms of reliability, believed that her error rate was within acceptable tolerance, and believed that any falsing issues were both resolved and unrelated to parcels.  He also took extra steps to avoid any potential falsing issues by touching numerous boxes before running Whinny.  There is insufficient evidence to suggest that Meyer recklessly concealed information that would implicate the reliability of Whinny's sniff test.  Whinny's alert was sufficiently reliable to constitute probable cause, and – were the warrant not supported by probable cause – the good-faith exception applies.  Thus, the evidence is not inadmissible on Fourth Amendment grounds.

## V.    MOTION FOR IN-COURT RECORDINGS

Ferguson also filed a *pro se* Motion for In-Court Recordings.  (Mot. for In-Court Recordings, Dec. 28, 2017, Docket No. 40.)  The Court will deny the Motion without prejudice and encourages Ferguson to continue working with counsel on this issue.

## CONCLUSION

Meyer had reasonable articulable suspicion to seize the FedEx package, and Whinny's alert provided probable cause for a search warrant. Thus, Ferguson's Fourth Amendment rights were not violated. Even if the search warrant were not supported by probable cause, the evidence would be admissible under the good-faith exception. As such, the Court will overrule Ferguson's Objections, adopt the Magistrate Judge's R&R, and deny Ferguson's Motion to Suppress.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant's Objections to the Magistrate Judge's Report and Recommendation [Docket No. 39] are **OVERRULED** and the Magistrate Judge's Report and Recommendation [Docket No. 36] is **ADOPTED.**

2.    Defendant's Pretrial Motion to Suppress Search and Seizure [Docket No. 20] is **DENIED**.

3.    Defendant's Motion for In-Court Recordings [Docket No. 40] is **DENIED without prejudice.**

DATED:  January 29, 2018                          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                              Chief Judge
                                                   United States District Court